JESSICA I. ROTHSCHILD, SBN 278712
STEPTOE LLP
1330 Connecticut Ave., NW
Washington, DC 20036

One Market Plaza
Steuart Tower, 10th floor
Suite 1070
San Francisco, CA 94105
415 365 6700

CHRISTOPHER S. NIEWOEHNER (*pro hac vice* to be filed)
STEPTOE LLP
227 W. Monroe, Suite 4700
Chicago, IL 60606
312 577 1240

Attorneys for Plaintiff,
META PLATFORMS, INC.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., a Delaware Corporation, | Case No. |
| *Plaintiff*, | |
| v. | **COMPLAINT FOR BREACH OF CONTRACT, FRAUD** |
| JUDANG TEAM LLC, a Florida Limited Liability Company, | **DEMAND FOR JURY TRIAL** |
| PERFEOS LLC d/b/a SHOP AT MARS, a Florida Limited Liability Company, | |
| JOT & JOURNEYS aka JOT & JOURNEY, an unincorporated Florida business, and | |
| ANTONIO JOSÉ LIÉVANO, in his individual capacity and d/b/a "Judang Team," "Jot & Journeys," and "Shop at Mars," | |
| *Defendants*. | |

Plaintiff Meta Platforms, Inc. ("Meta") alleges the following:

1
COMPLAINT

## **INTRODUCTION**

1.      Since no later than October 2023 and continuing through at least June 2024, Defendants Judang Team LLC ("Judang Team"), Perfeos LLC d/b/a Shop at Mars ("Perfeos"), and Antonio José Liévano ("Liévano"), individually and acting through Judang Team, Perfeos, and his unincorporated business Jot & Journeys ("J&J"), (collectively, "Defendants") operated a deceptive and misleading advertising scheme on Facebook and Instagram.

2.      Defendants used fraudulent financial documents to improperly obtain more than $8 million in advertising credit lines from Meta for which they never paid Meta. Defendants used the fraudulently obtained advertising credit lines to purchase ads on Facebook and Instagram promoting a variety of merchandise. When a Facebook or Instagram user clicked on one of Defendants' ads, the users were redirected to websites operated by Defendants, including shopatmars.com. After placing orders though Defendants' websites, users received merchandise that was different and of lesser quality than what Defendants advertised or did not receive any merchandise at all. This practice is known as a "bait-and-switch" scheme. Additionally, several Facebook and Instagram users who placed an order on Defendants' websites received recurring, unauthorized charges on their credit cards. This practice is known as "subscription fraud." Defendants took steps to conceal their fraudulent schemes, including by blocking customer complaints and negative product reviews placed on Defendants' Facebook Pages, and creating fake financial records.

3.      Defendants' actions violate Meta's Terms of Service ("Meta's Terms"), Instagram's Terms of Use ("Instagram's Terms"), Meta's Advertising Standards ("Meta's Ad Standards"), Meta's Commercial Terms ("Meta's Commercial Terms"), Meta's Self-Service Advertising Terms ("Meta's Self-Serve Ad Terms"), and Meta's Facebook Online Invoicing Terms and Conditions ("Meta's Online Invoicing Terms") (collectively, "Meta's and Instagram's Terms and Policies"); and California law. Meta previously (a) took technical enforcement actions against Defendants' advertisements, advertising accounts, Facebook Pages, and user accounts; (b) sent a cease-and-desist letter to Defendants that demanded they stop violating Meta's and Instagram's Terms and Policies and provide payment for outstanding ad credit line balances; and

(c) revoked Defendants' access to Meta services, including Facebook and Instagram. Subsequently, and in further violation of Meta's Terms and Instagram's Terms, Defendants created new Facebook and Instagram accounts and continued using Facebook and Instagram. Meta now brings this action for a permanent injunction that prohibits Defendants from continuing their bait and switch and subscription schemes, and to recover damages.

## **PARTIES**

4.    Plaintiff Meta is a Delaware corporation with its principal place of business in Menlo Park, San Mateo County, California. Meta owns and operates several services, including Facebook, Instagram, and WhatsApp.

5.    Defendant Judang Team is a Florida Corporation, with a principal address at 1915 Northeast 20th Avenue, Fort Lauderdale, Florida 33305. On its website, judangteam.com, Judang Team promotes itself as a social media manager, purporting to "manage[] content that averages over 1 billion views per month across its channels and influencer partnerships."

6.    Defendant Perfeos is a Florida Corporation, with a principal address at 2916 North Miami Avenue, Miami, Florida 33127. On its website, shopatmars.com, Perfeos purports to sell various merchandise.

7.    Defendant J&J is an unincorporated Florida business, with purported addresses at 121 Northeast 34th Street, Miami, Florida 33137 and 2916 North Miami Avenue, Miami, Florida 33127. On its website, jotandjourney.com, J&J purports to sell various consumer goods including stationary products and energy drinks.

8.    Defendant Liévano is a resident of Miami, Florida. Upon information and belief, Liévano is the founder and sole member of Judang Team and Perfeos. He also operates J&J. On his LinkedIn page, Liévano claims to have "[r]ecord" eCommerce sales ranging from $475,000 to $826,000 "in a Day."

**Figure 1: Photo of Antonio Liévano from His Facebook Profile**



9.      On information and belief, at all times material to this action, Defendants were the agents, employees, and/or co-conspirators with each of the remaining Defendants and were acting within the scope of such agency, employment, and/or conspiracy.  At all times material to this action, each Defendant was the agent of the other Defendant.  Each Defendant acted with the knowledge, permission, and consent of the other Defendant; and each Defendant aided and abetted the other Defendant in the acts or omissions alleged in this Complaint.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over all the causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332 because complete diversity between Plaintiff and Defendants exists, and because the amount in controversy exceeds $75,000.

11.     The Court has personal jurisdiction over Defendants because Defendants created, controlled, and used multiple Facebook and Instagram accounts and thereby had notice of and

agreed to Meta's Terms and Meta's Commercial Terms, which contain a forum selection clause that requires Defendants to submit to the jurisdiction of the U.S. District Court for the Northern District of California or a state court located in San Mateo County.

12.     The Court also has personal jurisdiction because Defendants purposefully directed their conduct at Plaintiff, which has its principal place of business in California.  For example, Defendants requested ad credit lines from Meta, a California business, and then purposefully used Meta's ad services to purchase and run deceptive and misleading advertisements on Facebook and Instagram using that credit.  Additionally, Defendants purposefully directed their misleading and deceptive ads at Facebook and Instagram users in California, and Facebook and Instagram users in California actually clicked on those ads and purchased defective, low-quality, and misleading products that were part of Defendants' bait-and-switch scheme.  Plaintiff's claims arise directly from and relate to these California contacts.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as the threatened and actual harm to the Plaintiff occurred in this district.  Additionally, by agreeing to the forum selection clause, Defendants agreed that venue in this Court is proper.

14.     Pursuant to Civil L.R. 3-2(c & d), this case may be assigned to either the San Francisco or Oakland division because Meta is located in San Mateo County.

## FACTUAL ALLEGATIONS

### 1. Background on Meta

15.     Meta owns and operates Facebook, which is an online service that is available on computers and mobile devices which helps give people the power to build community, share life's moments and discuss what is happening, and discover and connect to interests through Feed, Reels, Stories, Groups, Marketplace, and more.

16.     Meta also owns and operates Instagram, which is a free photo and video sharing service and mobile application.  Instagram users can upload photos and videos to Instagram and share them with others.  They can also view, comment, and like on posts shared by others on Instagram.

17.     Meta also owns WhatsApp, an encrypted communication service available on mobile devices and desktop computers.  WhatsApp relies on Meta's infrastructure, such as servers, to support people around the world with fast, reliable, and private services.

18.     In addition to Facebook, Instagram, and WhatsApp, Meta also operates various business and advertising services (collectively, "Meta's Services").

**2.  Advertising on Facebook and Instagram**

19.     At all relevant times, including from October 2023 to June 2024, businesses and individuals with a Facebook or Instagram account could create and place ads on Facebook and Instagram.

20.     To create and publish an ad on Facebook, an advertiser must agree to Meta's Terms, Meta's Self-Serve Ad Terms, Meta's Commercial Terms, and Meta's Ad Standards.  To advertise on Instagram, an advertiser must additionally agree to Instagram's Terms.  Advertisers are also subject to Meta's Community Standards and Instagram's Community Guidelines.

21.     Certain business accounts are eligible to apply for ad credit lines.  Once approved, advertisers are provided a credit line for limited ad costs, which represents the maximum amount a business could spend on ads on a monthly basis before payment is required.  Monthly invoices are provided for any ads purchased using these credit lines and are payable within 30 days of issuing.  Businesses may seek modifications to their credit lines, for instance, to increase limits.

22.     Meta periodically reviews products sold through ads placed on Facebook and Instagram.  Meta's review includes solicitation of feedback from a random sample of customers that purchased products after clicking on an ad on Facebook or Instagram.  Meta also employs shoppers to purchase products through ads placed on Facebook or Instagram and provide feedback on their experiences.

23.     Meta can take a range of enforcement actions against an advertiser who violates Meta's and Instagram's Terms and Policies, including banning an ad account from running ads or disabling all Facebook and Instagram accounts belonging to an advertiser.

24.     A Facebook Page is a public page on Facebook designed for businesses, organizations, and public figures.  Only a Facebook user can create or manage a Facebook

Page.  Facebook Pages are managed by Facebook users who have the role of administrators or moderators.

25.     Page administrators and moderators can create and run ads and promotions on behalf of their Facebook Pages.

26.     Any Facebook user can leave comments on a Facebook Page.  Facebook Page administrators and moderators, however, have the ability to control the content users post on their Page.  Administrators or moderators can choose to block specific words or phrases from appearing on their Facebook Pages.  When someone comments on a Page using a word that the Page administrator or moderator has blocked, the comment is hidden from the Page.

**3.   Meta's and Instagram's Terms and Policies**

**A.     Meta's Terms**

27.     Everyone who uses Facebook must agree to Meta's Terms (available at https://www.facebook.com/terms.php) and other rules that govern access to and use of Facebook (collectively, "Meta's Terms and Policies").

28.     At all relevant times, Meta's Terms have prohibited, among other things, violations of Meta's Community Standards (see https://transparency.meta.com/policies/community-standards), Meta's Ad Standards (see https://transparency.meta.com/policies/ad-standards/), and Meta's Commercial Terms (see https://facebook.com/legal/commercial_terms) ("Meta's Commercial Terms").

29.     Meta's Terms prohibit users from doing or sharing anything "that is unlawful, misleading, discriminatory or fraudulent (or assists someone else in using our Products in such a way)."

30.     Meta's Terms prohibit users from doing anything to "impair the proper working, integrity, operation, or appearance of our services, systems, or Products."

31.     Meta's Terms state that a person cannot use Facebook if Meta "previously disabled your account for violations of our Terms, the Community Standards, or other terms and policies that apply to your use of Facebook."

**B. Instagram's Terms**

32. At all relevant times, everyone who used Instagram agreed to Instagram's Terms (see https://help.instagram.com/581066165581870) and to other rules that govern access to and use of Instagram, including Instagram's Community Guidelines and Platform Policies (collectively, "Instagram's Terms and Policies").

33. Instagram's Terms prohibit users from doing "anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose."

34. Instagram's Terms prohibit users from doing "anything to interfere with or impair the intended operation of [Instagram]."

35. Instagram's Terms state that a person cannot use Instagram if Meta has previously disabled the user's account for violating any of Meta's policies.

**C. Meta's Commercial Terms, Ad Standards, Self-Serve Ad Terms, and Online Invoicing Terms**

36. At all relevant times, Meta's Commercial Terms applied to access or use of Meta products for a business or commercial purpose, including "using ads, selling products," and "managing a Page." Meta's Commercial Terms equally apply to activities Meta users perform on behalf of third parties.

37. When accessing Meta's services on behalf of a third party, Meta's Commercial Terms require a user to "ensure that any third party on whose behalf [they] access or use any Meta Product for any business or commercial purpose will abide by the applicable terms of use, including these Commercial Terms, the Meta Terms of Service ('Terms'), and any applicable supplemental terms." They must also "represent and warrant that [they] have the authority to bind that third party to such terms."

38. Meta's Commercial Terms require that "access or use of the Meta products for business or commercial purposes complies with all applicable laws, rules, and regulations."

39. At all relevant times, Meta's Ad Standards "appl[ied] to (1) ads and commercial content served by or purchased through Meta . . . , (2) ads appearing within apps on Meta [e.g.,

Facebook], and (3) ads on Instagram." Meta's Ad Standards equally apply to ads Meta users create and run, or cause to be created and run, on behalf of third parties.

40.    Meta's Ad Standards "prohibit ads promoting products, services, schemes or offers using deceptive or misleading practices, including those meant to scam people out of money or personal information."

41.    At all relevant times, Meta's Self-Serve Ad Terms (available at https://www.facebook.com/legal/self_service_ads_terms) applied to "use of Meta Products (such as the self-service advertising interfaces and APIs) for creation, submission and/or delivery of any advertising or other commercial or sponsored activity or content (collectively, 'Self-Serve Ad Interfaces') . . . and any order you place through the Self-Serve Ad Interfaces ('Order')."

42.    Meta's Self-Serve Ad Terms state that "ads must comply with all applicable laws, regulations, and guidelines, as well as our Advertising [Standards]" and that "[f]ailure to comply may result in a variety of consequences, including the cancellation of ads you have placed and termination of your account."

43.    Meta's Self-Serve Ad Terms require payment of "all amounts specified in each Order you place, along with any applicable taxes." Meta's Self-Serve Ad Terms equally apply to ads Meta users create and run, or cause to be created and run, on behalf of third parties.

44.    Meta's Self-Serve Ad Terms provide notice that if an "account is past due, we may take additional steps to collect past due amounts. You will pay all expenses associated with such collection, including reasonable attorneys' fees. Past due amounts will accrue interest at 1% per month or the lawful maximum, whichever is less."

45.    At all relevant times, Meta's Facebook Online Invoicing Terms and Conditions (available upon log in at https://business.facebook.com/terms_ads_invoicing.php) ("Meta's Online Invoicing Terms") applied in addition to Meta's Self-Serve Ad Terms "[w]ith respect to any Order that you place through Facebook's online advertising portal for which Facebook agrees to invoice you." For such orders, Meta's Self-Serve Ad Terms, as modified by Meta's Online Invoicing Terms, require that users "make all payments within thirty (30) days of the date of the applicable invoice."

**D.    Defendants Agreed to Meta's and Instagram's Terms and Policies**

46.    At all relevant times, Defendants had notice of, agreed to, and were bound by Meta's and Instagram's Terms and Policies.

47.    Between February 13, 2019, and February 10, 2025, Defendant Liévano created, controlled, and used multiple Facebook user accounts and thereby had notice of and agreed to Meta's Terms, including:

    a.    Liévano created a Facebook user account on February 13, 2019, with the name "Antonio," which he then controlled and used.

    b.    Liévano created a Facebook user account on March 11, 2023, with the name "Antonio José Liévano," which he then controlled and used.

    c.    Liévano also controlled and used one or more other Facebook user accounts during this time.

48.    Between September 7, 2011, and February 10, 2025, Defendant Liévano created, controlled, and used multiple Instagram accounts and thereby had notice of and agreed to Instagram's Terms, including:

    a.    Liévano created or caused to be created an Instagram account on September 7, 2011, with the username "sofloantonio," which he then controlled and used.

    b.    Liévano created or caused to be created an Instagram account on January 7, 2019, with the username "sofloantonio1," which he then controlled and used.

    c.    Liévano created or caused to be created an Instagram account on August 26, 2020, with the username "antoniojudang," which he then controlled and used.

    d.    Liévano also controlled and used multiple other Instagram accounts during this time, including with the usernames "antonio," "slay," "____funnymemes__," and "miss.jiyou."

49.    Additionally, even after being told to cease and desist, Liévano controlled and used a Facebook user account with the name "Sunghwan Oh" starting on February 24, 2025 and continuing to about April 4, 2025, when Meta disabled the account.  Liévano also controlled and

used an Instagram account with the name "antonioazasu" starting on February 11, 2025 and continuing to about April 4, 2025, when Meta disabled the account.

50.     Defendants Judang Team, Perfeos, and J&J had notice of, agreed to, and were bound by Meta's Terms and Instagram's Terms because, through their agents and employees they accessed and used, and caused to be accessed and used, Facebook and Instagram to run ads. Between February 2021 and July 2024, Judang Team, Perfeos, and J&J created and ran, and caused to be created and run, over 9,000 ads on Facebook and Instagram.  Additionally, Judang Team, Perfeos, and J&J created, managed or used more than 100 Facebook Pages and more than 40 Business Manager accounts.

51.     At all relevant times, Defendants also had notice of, agreed to, and were bound by Meta's Commercial Terms, Meta's Self-Serve Ad Terms, and Meta's Online Invoicing Terms. Defendants were additionally required, including by Meta's Self-Serve Ad Terms, to comply with Meta's Ad Standards.

52.     Between February 2021 and February 11, 2025, Defendants, including by and through Liévano, created and controlled multiple Meta business and related advertising accounts and thereby had notice of and agreed to Meta's Commercial Terms, Meta's Self-Serve Ad Terms, Meta's Online Invoicing Terms, and Meta's Ad Standards, including:

  a. Judang Team created a Facebook business account on February 1, 2021, which it then controlled and used, with the name "Judang Team." Judang Team also created and controlled advertising accounts related to this Facebook business account.

  b. Perfeos created a Facebook business account on July 17, 2023, which it then controlled and used, with the name "Shop at Mars."  Perfeos also created and controlled advertising accounts related to this Facebook business account.

  c. J&J created a Facebook business account on October 29, 2023, which it then controlled and used, with the name "Jot & Journeys."  J&J also created and controlled advertising accounts related to this Facebook business account.

  d. Additionally, Defendants created, controlled, or used more than 40 other Business Manager accounts, such as "Cute Girl Shop" and "SoFlo Marketing LLC."

     e.   Between February 2021 and July 2024, Judang Team, Perfeos, and J&J created, controlled, and used, and caused to be created and used, over 9,000 ads on Facebook and Instagram.

53.   Defendants, including by and through Liévano, created and administered many Facebook Pages at least as early as 2022, including:

     a.   Judang Team created a Facebook Page on September 7, 2022, which it then controlled and used, with the name "Judang Team."

     b.   Perfeos created a Facebook Page on September 25, 2023, which it then controlled and used, with the name "Shop at Mars."

     c.   J&J created a Facebook Page on January 19, 2024, which it then controlled and used, with the name "Jot & Journeys."

     d.   Additionally, Defendants, including by and through Liévano, created, managed or used more than 100 other Facebook Pages, such as "Design Domain," "Crafty Creations," and "Beauty Beacon."

**4. Defendants Bait-and-Switch and Subscription Schemes**

54.   Since no later than October 2023, Defendants facilitated bait-and-switch and subscription fraud schemes using Facebook and Instagram ads targeted at Facebook and Instagram users in, among other countries, the United States. Defendants' schemes proceeded generally in five steps:

     a.   Defendants fraudulently obtained advertising credit lines and credit line increases from Meta, including by using fraudulent financial records.

     b.   Defendants used the fraudulently obtained advertising credit lines to place ads on Facebook and Instagram, including through Facebook Pages under their control, promoting the sale of various merchandise. Users who clicked on these ads were then taken to Defendants' websites to order and pay for the advertised merchandise.

     c.   After users placed orders on Defendants' websites, Defendants either sent products to those users that were different and of inferior quality or never sent the merchandise.

d.    Defendants charged recurring subscription fees to users that those users did not authorize.

e.    Defendants took steps to conceal their schemes, including by blocking and removing customer complaints and negative reviews from their Facebook Pages.  The removal of these negative comments was designed to mislead, deceive, and misrepresent the true nature of the products by concealing negative comments by users that exposed Defendants' bait-and-switch scheme.

**A.    Defendants Used False and Materially Misleading Documents and Statements to Induce Meta to Provide More Than $8.1 Million in Ad Credit Lines**

55.    Defendants funded their bait-and-switch and subscription schemes, in part, by defrauding Meta.  Defendants knowingly submitted false and materially misleading documents and made false and misleading statements in order to induce Meta into providing multiple credit line increases.  Meta reasonably and justifiably relied on Defendants' false and materially misleading information, ultimately providing them more than $8.1 million in ad credit lines.  Defendants spent to the limits of their ad credit lines and have not repaid the outstanding balance.

56.    On or about April 1, 2024, Defendants submitted a purported J&J fiscal year 2022 balance sheet to obtain a credit line increase for J&J.  Upon information and belief, this J&J fiscal year 2022 balance sheet was false and materially misleading.  For instance, the J&J fiscal year 2022 balance sheet, shown in Figure 2, is substantively identical to the Perfeos fiscal year 2022 balance sheet, shown in Figure 3, that Defendants subsequently submitted to Meta on or about April 23, 2024 to obtain a separate advertising credit line increase.  It is also substantively identical to the Judang Team fiscal year 2023 balance sheet, shown in Figure 4, that Defendants subsequently submitted to Meta on or about May 27, 2024 to obtain yet another advertising credit line increase.

**Figure 2:  J&J Fiscal Year 2022 Balance Sheet (Ex. 1) at p. 2**



JOT & JOURNEYS
Balance Sheet
December 31, 2022

ASSETS

Current Assets

| | | |
|---|---|---|
| Bank of America 2854 | 375.37 | |
| Bank of America 0306 | 492.82 | |
| Paypal Jot & Journeys | 72,136.69 | |
| Paypal Shop at Mars | 17,824.76 | |
| Total Current Assets | | 90,829.64 |
| Property and Equipment | | |
| Total Property and Equipment | | 0.00 |
| Other Assets | | |
| Total Other Assets | | 0.00 |
| Total Assets | | 90,829.64 |

LIABILITIES AND CAPITAL

Current Liabilities

| | | |
|---|---|---|
| American Express 1006 | 271.23 | |
| Total Current Liabilities | | 271.23 |
| Long-Term Liabilities | | |
| Total Long-Term Liabilities | | 0.00 |
| Total Liabilities | | 271.23 |
| Capital | | |
| Common Stock | 1,000.00 | |
| Paid-in Capital | 2,479.00 | |
| Retained Earnings | 84,031.21 | |
| Member's Cont/Draw | (810,438.93) | |
| Net Income | 813,487.13 | |
| Total Capital | | 90,558.41 |
| Total Liabilities & Capital | | 90,829.64 |

SFS

SILVA'S
FINANCIAL SERVICES

5220 S UNIVERSITY DRIVE
SUITE C-102
DAVIE, FL 33328

20801 BISCAYNE BLVD
4th FLOOR
AVENTURA, FL 33180

T. 305.944.9755
F. 888.401.1914

www.silvasfinancialservices.com

COMPLAINT

**Figure 3: Perfeos's "Shop at Mars" Fiscal Year 2022 Balance Sheet (Ex. 2) at p. 2**

**Figure 4: Judang Team Fiscal Year 2023 Balance Sheet (Ex. 3) at p. 2**



57.     Taken together, other financial documents submitted by Defendants with their credit line applications, including balance sheets, income statements, and banking statements, show that Defendants submitted a series of false documents.

58.     Meta reasonably and justifiably relied on these false and materially misleading financial statements and Defendants' related statements and omissions when deciding to approve Defendants' requests for credit line increases.

59.    Defendants stopped paying their ad invoices in April 2024. Defendants accumulated an outstanding balance of, at least, $8,111,746.62.

**B.    Defendants Placed Deceptive and Misleading Ads and Redirected Users Away from Meta's Services**

60.    Starting no later than October 2023 and continuing until in or around June 2024, to facilitate their bait-and-switch and subscription schemes, Defendants placed more than 9,000 deceptive and misleading ads for merchandise on Facebook and Instagram. Defendants paid for some of these ads using the fraudulently obtained ad credit lines from Meta.

61.    Defendants' ads targeted users for merchandise, including portable steamers and magnetic car phone holders for cars, which Defendants sold through their websites, including the Shop at Mars website, www.shopatmars.com. Defendants ran these ads on Instagram and Facebook, including through Facebook Pages they controlled with names such as "Crafty Creations," "Design Domain," "Shop at Mars," and "Beauty Beacon." When users clicked these ads, they were redirected away from Meta's services to Defendants' e-commerce websites, including, most frequently, www.shopatmars.com.

62.    After arriving at Defendants' e-commerce websites, these users were presented with the opportunity to purchase advertised merchandise through these websites. Some users did purchase merchandise from Defendants' e-commerce websites.

**C.    Defendants Sent Users Inferior Products or Never Sent Products at All**

63.    Facebook and Instagram users that clicked on Defendants' ads and purchased merchandise from Defendants' e-commerce websites received inferior merchandise, if they received merchandise at all.

64.    Some users that purchased Defendants' products received a Meta survey about their purchase experience. Those users reported receiving low-quality and counterfeit goods, unfulfilled purchases, and an inability to contact Defendants to correct these issues. Survey comments included:

- "I never received the item and contacting this company ie *[sic]* a joke. . . . SCAM"

- "false advertisement. . . . what a rip off. couldn't even get a refund."

● "Charged my account within a week but still have not received it."

● "took my money never shipped what I ordered would not respond to me"

65.    On or about April 8, 2024, Defendants ran an advertisement for a "Mini Electric Shaver" on Instagram and Facebook, including on the "Eco Essence" Facebook Page, which Defendants controlled.  Defendants directed the ad at users located in the United States.  Users who clicked on the ad shown in Figure 5 were redirected to Defendants' Shop at Mars e-commerce website to complete their purchase.  One user who clicked on Defendants' ad and purchased the Mini Electric Shaver from the Shop at Mars website reported that "[t]he shaver did not cut my hair like advertised, plus it was weeks late, plus I had to provide my own charger adapter. I will never order from them again."

**Figure 5:  Defendants' "Mini Electric Shaver" Ad, which was created and run starting on April 8, 2024, as it appeared on Instagram**



**D.    Defendants Charged Users Unauthorized Recurring Subscription Fees**

66.    In addition to receiving inferior merchandise, if any at all, Facebook and Instagram users that clicked on Defendants' ads and made purchases through Defendants' e-commerce websites were charged recurring subscription fees that they did not authorize.    Some Facebook and Instagram users that completed a Meta survey about their purchase experience reported:

- "My order never arrived and there's a recurring charge I did not authorize."

- "I purchase [sic] something small and since then they have been trying to take money out of my bank account ever since. every day. I'm very dissatisfied with this company"

67.    On or about January 20, 2024, Defendants ran an advertisement for a "Chic Organization: Automated Egg Rack" on Instagram and Facebook, including on the "Shop at Mars" Facebook Page.    Defendants directed the ad at users located in the United States.    Users who clicked on the ad shown in Figure 6 were redirected to Defendants' Shop at Mars e-commerce website to complete their purchase. After completing the purchase, some users were charged unauthorized recurring subscription fees.    One user who clicked on Defendants' ad and purchased the Automated Egg Rack reported that Defendants "signed me up for some bullshit monthly thing at $50 a month and now I can't contact [Defendants] so I had to cancel my credit card."

**Figure 6:  Defendants' "Automated Egg Rack" Ad, which was created and run starting on January 20, 2024, as it appeared on Instagram**



**E.      Defendants Attempted to Conceal the True Nature of Their Business**

68.      Defendants attempted to conceal their schemes from Meta and its users by blocking users from posting complaints and negative reviews on Defendants' Facebook Pages.   For example, on the Jot & Journeys Facebook Page, Defendants used their status as Page administrators to automatically block comments that included words and phrases like "poor quality," "knock off," "scam," "fraud," "fake reviews," "misleading," "didn't work," "never received," and "don't order."   This meant that if a user posted a comment that included any of these words, it would automatically be hidden from the Page.   In total, Defendants blocked more than 1,000 words and phrases associated with poor product quality, failure to deliver products, slow delivery times, and negative customer experience from Facebook Pages they controlled.

**5.   Meta's Enforcement Actions Against Defendants**

69.      Between June 3 and June 17, 2024, Meta denied ad credit line increases to Defendants.

70.      On or about June 24, 2024, Meta suspended the J&J and Perfeos credit lines after finding that Defendants had violated Meta's Self-Serve Ad Terms and Meta's Online Invoicing Terms.

71.      On or about July 18, 2024, Meta suspended the Judang Team credit line after finding that Defendants violated Meta's Self-Serve Ad Terms and Meta's Online Invoicing Terms.

72.      On February 11, 2025, Meta sent a cease and desist letter (Ex. 4) to Defendants for their violations of Meta's and Instagram's Terms, Ad Policies, and Self-Serve Ad Terms, and failure to pay ad invoices.   At that time, Meta also disabled more than 150 Facebook user accounts, Instagram accounts, business accounts, and Facebook Pages associated with Defendants.

73.       In the cease-and-desist letter, Meta provided the URLs where Meta's Terms and Instagram's Terms can be viewed and demanded that Defendants stop violating them, including by conducting unlawful, misleading, deceptive activities on Facebook and Instagram, advertising products or services intended to scam people, misleading users and impairing the intended operation of Facebook and Instagram, and failing to pay all amounts invoiced for ads purchased from Meta.   Meta's cease and desist letter also informed Defendants that Meta had revoked their

licenses to access Facebook and Instagram and that Defendants were no longer authorized to access Facebook or Instagram "for any reason whatsoever."

74.    Beginning on or about February 11, 2025, after Plaintiff revoked Defendants' access to use Facebook and Instagram, Defendants created a new Facebook user account named "Sunghwan Oh" and a new Instagram account named "antonioazasu." Meta disabled those newly created user accounts on or about April 4, 2025.

## FIRST CAUSE OF ACTION

### (BREACH OF CONTRACT)

75.    Plaintiff realleges and incorporates all preceding paragraphs here.

76.    Since at least 2021 Defendants and their agents and employees created, controlled, and used multiple Facebook and Instagram accounts, advertising accounts, and Facebook Pages, and thereby received notice of, agreed to, and were bound by Meta's and Instagram's Terms and Policies. Meta's and Instagram's Terms and Policies constitute valid and enforceable agreements between Defendants and Plaintiff.

77.    Plaintiff has performed all conditions, covenants, and promises required of it in accordance with Meta's and Instagram's Terms and Policies by providing access to the Facebook and Instagram services.

78.    Defendants breached Meta's Terms, including by violating provisions which prohibit users from (1) doing "anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose," and (2) "impair[ing] the proper working, integrity, operation, or appearance of our services, systems, or Products." Defendants breached Meta's Terms by placing deceptive and misleading ads on Facebook, and submitting false and materially misleading documents and making false and materially misleading statements to Plaintiff when seeking ad credit lines to run ads.

79.    Defendants breached Instagram's Terms, including by violating provisions which prohibit users from (1) doing "anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose," and (2) doing "anything to interfere with or impair the intended operation of [Instagram]." Defendants breached Instagram's Terms by placing deceptive and misleading

1    ads on Instagram, and submitting false and materially misleading documents and making false and

2    materially misleading statements to Plaintiff when seeking ad credit lines to run ads on Instagram.

3        80.    Defendants breached Meta's Commercial Terms, including by violating provisions

4    which require (1) users "ensure that any third party on whose behalf [they] access or use any Meta

5    Product for any business or commercial purpose will abide by the applicable terms of use,

6    including these Commercial Terms, the Meta Terms of Service ('Terms'), and any applicable

7    supplemental terms" and that "access or use of the Meta products for business or commercial

8    purposes complies with all applicable laws, rules, and regulations." Defendants breached Meta's

9    Commercial Terms by submitting false and materially misleading documents and making false

10   and materially misleading statements to Plaintiff when seeking advertising credit lines, and

11   otherwise violating Meta's Terms and Instagram's Terms.

12       81.    Defendants breached Meta's Self-Serve Ad Terms, including by violating

13   provisions which require (1) that "ads must comply with all applicable laws, regulations, and

14   guidelines, as well as our Advertising Policies" including Meta's Ad Standards, and (2) payment

15   of "all amounts specified in each Order you place, along with any applicable taxes." Additionally,

16   Defendants breached Meta's Online Invoicing Terms, including by violating provisions which

17   require users to "make all payments within thirty (30) days of the date of the applicable invoice."

18   Defendants breached Meta's Self-Serve Ad Terms and Meta's Online Invoicing Terms, by placing

19   deceptive and misleading ads on Facebook and Instagram, submitting false and materially

20   misleading documents and making false and materially misleading statements to Plaintiff when

21   seeking ad credit lines, failing to pay for ads Defendants ran on Facebook and Instagram, and

22   failing to pay outstanding invoices within thirty (30) days.

23       82.    Meta's and Instagram's Terms and Policies also prohibit someone from using

24   Meta's Services if Meta previously disabled that person's user account for violating any of Meta's

25   or Instagram's Terms and Policies. Defendants breached Meta's and Instagram's Terms and

26   Policies by creating new Instagram and business accounts, and continuing to use Instagram after

27   February 11, 2025 when Meta disabled Defendants' Facebook, Instagram, and business accounts

28

and sent Defendants a cease-and-desist letter informing him that he was no longer authorized to access Meta's Services.

83.     Defendants' breaches have caused Plaintiff damages, in an amount to be proven at trial and in excess of $75,000.

84.     Plaintiff has suffered irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## SECOND CAUSE OF ACTION

### (FRAUD)

85.     Plaintiff realleges and incorporates all preceding paragraphs here.

86.     Defendants intentionally and knowingly submitted false and materially misleading documents and otherwise provided false or materially misleading information regarding their financial states and assets to Plaintiff as part of their applications related to ad credit lines.  For example, Defendants knowingly submitted false and materially misleading financial statements, income statements, and banking records to prove the creditworthiness of Judang Team, Perfeos, and J&J during their applications for advertising credit lines and credit line increases from Plaintiffs.

87.     Defendants intentionally and knowingly withheld material information regarding their financial states and assets from Plaintiff as part of their applications related to ad credit lines.  For example, Defendants did not tell Plaintiff that they submitted the same financial documentation for multiple entities.  And, in response to Plaintiff's request for audited financial statements, Defendants did not tell Plaintiff that the financial statements they submitted were not audited.  Further, Defendants failed to disclose their actual financial documentation.

88.     Defendants intentionally submitted these documents and/or withheld information to induce Plaintiff to provide Judang Team, Perfeos, and J&J with advertising credit lines and credit line increases.

89.     Plaintiff reasonably relied on Defendants' falsehoods and material misrepresentations and/or omissions, including Defendants' false and materially misleading

financial statements and banking records, when evaluating the creditworthiness of Judang Team, Perfeos, and J&J and deciding to provide advertising credit lines and credit line increases.

90.    Once Meta approved credit lines and credit line increases for Judang Team, Perfeos, and J&J, Defendants exhausted the advertising credit lines Meta provided.  Defendants have not paid their outstanding invoices, which are now overdue.

91.    Plaintiff suffered damages as a result of these violations in an amount to be determined at trial and an amount in excess of $75,000.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the Court enter judgment against Defendants as follows:

1.    Defendants have breached their contracts with Plaintiff in violation of California law;

2.    Defendants have committed fraud in violation of California law;

3.    A permanent injunction enjoining and restraining Defendants and their agents, servants, employees, successors, and assigns, and all other persons acting in concert or conspiring with any of them or who are affiliated with Defendants from:

a.    Accessing, attempting to access, and using Plaintiff's services, platforms, and computer systems;

b.    Creating or maintaining any Facebook or Instagram accounts, advertising accounts, Facebook Pages, or any other Meta account in violation of the Applicable Terms and Policies;

c.    Using Plaintiff's services, platforms, and computer systems to engage in any unlawful, misleading, or fraudulent activity, or facilitating others to do the same;

4.    That Plaintiff be awarded damages, including, but not limited to, compensatory and statutory damages, as permitted by law and in such amounts to be proven at trial;

5.    That Plaintiff be awarded their reasonable costs, including reasonable attorneys' fees;

6.    Pre- and post-judgment interest as allowed by law; and

7.    All other equitable and legal relief the Court deems just and proper.

**PLAINTIFF RESPECTFULLY DEMANDS A JURY TRIAL.**

Dated: June 18, 2025

Respectfully submitted,

/s/ Jessica I. Rothschild
Jessica I. Rothschild
Email: jrothschild@steptoe.com
STEPTOE LLP
1330 Connecticut Ave., NW
Washington, DC 20036
202 429 1370

One Market Plaza
Steuart Tower,
10th floor
Suite 1070
San Francisco, CA 94105
415 365 6700

Christopher S. Niewoehner
(*pro hac vice* to be filed)
Email: cniewoehner@steptoe.com
STEPTOE LLP
227 W. Monroe Street
Suite 4700
Chicago, IL 60606
312 577 1240

Attorneys for Plaintiff META PLATFORMS, INC.