UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

META PLATFORMS, INC.,

        Plaintiff,

    v.

JUDANG TEAM LLC, et al.,

        Defendants.

Case No. 25-cv-05156-TSH

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

Re: Dkt. No. 33

## I.    INTRODUCTION

Plaintiff Meta Platforms, Inc. ("Meta") brings this action against Defendants Judang Team LLC, Perfeos LLC, Jot & Journeys, and Antonio Jose Liévano (collectively, "Defendants"), alleging that Defendants operated a deceptive and misleading advertising scheme on Meta's social media platforms and improperly obtained advertising credit lines from Meta. ECF No. 1. Pending before the Court is Defendants' Motion to Dismiss pursuant to Rule 12(b)(6). ECF No. 33 ("Mot."). The Court finds this matter suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and **VACATES** the February 12, 2026, hearing. For the reasons stated below, the Court **DENIES** the motion.[1]

## II.    BACKGROUND

### A.    Factual Background

Meta, a Delaware corporation with its principal place of business in California, owns and operates multiple social media platforms—including Facebook, Instagram, and WhatsApp—and various business and advertising services. Compl. ¶¶ 4, 15–18 (ECF No. 1). Facebook is "an

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 13, 32.

United States District Court
Northern District of California

online service that is available on computers and mobile devices" used to "discover and connect to interests." *Id.* ¶ 15. Instagram is "a free photo and video sharing service and mobile application." *Id.* ¶ 16. And WhatsApp is "an encrypted communication service available on mobile devices and desktop computers." *Id.* ¶ 17.

Defendant Judang Team LLC ("Judang"), a Florida limited liability company, "promotes itself as a social media manager" on its website, judangteam.com. *Id.* ¶ 5. Defendant Perfeos LLC ("Perfeos"), a Florida limited liability company, "purports to sell various merchandise" on its website, shopatmars.com. *Id.* ¶ 6. Defendant Jot & Journeys ("J&J"), an unincorporated Florida business, "purports to sell various consumer goods including stationary products and energy drinks" on its website, jotandjourney.com. *Id.* ¶ 7. Defendant Antonio Jose Liévano ("Liévano"), a resident of Florida, is the founder and sole member of Judang and Perfeos and operates J&J. *Id.* ¶ 8. Meta alleges Liévano acted individually and through his entities. *Id.* ¶ 1.

Overall, Meta alleges that Defendants (1) "used fraudulent financial documents to improperly obtain more than $8 million in advertising credit lines from Meta for which they never paid," and (2) "used the fraudulently obtained advertising credit lines to purchase ads on Facebook and Instagram" to facilitate Defendants' "bait-and-switch" and "subscription fraud" schemes. *Id.* ¶ 2.

### 1.    Meta's Services And Related Policies[2]

Meta offers various personal and business services through its social media platforms. Individuals and businesses can create user accounts on Facebook and Instagram. *Id.* ¶¶ 19, 27, 32. Any individual or business with a Facebook or Instagram account can create and place advertisements on Facebook and Instagram. *Id.* ¶ 19. And any Facebook user can create or manage a Facebook Page which is a public page designed for businesses, organizations, and public figures. *Id.* ¶ 24.

---

[2] As discussed below, Meta's Complaint implicates six policies: Meta's Terms of Service ("Meta's Terms"); Instagram's Terms of Use ("Instagram's Terms"); Meta's Advertising Standards ("Meta's Ad Standards"); Meta's Commercial Terms ("Meta's Commercial Terms"); Meta's Self-Service Advertising Terms ("Meta's Self-Serve Ad Terms"); and Meta's Facebook Online Invoicing Terms and Conditions ("Meta's Online Invoicing Terms"). Compl. ¶ 3. Collectively, Meta refers to these as, "Meta's and Instagram's Terms and Policies." *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

### a.      User Accounts

Anyone who creates a Facebook account must agree to Meta's Terms.  *Id.* ¶¶ 3, 27.  Meta's Terms prohibit users from (1) violating Meta's Community Standards, Meta's Ad Standards, or Meta's Commercial Terms; (2) doing or sharing anything "that is unlawful, misleading, discriminatory or fraudulent (or assists someone else in using [Meta's] Products in such a way"; and (3) doing anything to "impair the proper working, integrity, operation, or appearance of [Meta's] services, systems, or Products."  *Id.* ¶¶ 3, 28–30.  Under these Terms, users cannot use Facebook if Meta has previously disabled the user's account for violating any of Meta's policies.  *Id.* ¶ 31.

Anyone who creates or uses an Instagram account must agree to Instagram's Terms.  *Id.* ¶¶ 3, 32.  Instagram's Terms prohibit users from doing (1) "anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose"; and (2) "anything to interfere with or impair the intended operation of [Instagram]."  *Id.* ¶¶ 33–34.  Under these Terms, users cannot use Instagram if Meta has previously disabled the user's account for violating any of Meta's policies.  *Id.* ¶ 35.

### b.      Commercial Services

Anyone who creates and publishes an ad on Facebook must agree to Meta's Terms, Meta's Self-Serve Ad Terms, Meta's Commercial Terms, and Meta's Ad Standards.  *Id.* ¶¶ 3, 20.  These Terms apply equally to activities Meta users perform on behalf of third parties.  *Id.* ¶¶ 36, 39, 43.  Anyone who advertises on Instagram must additionally agree to Instagram's Terms.  *Id.* ¶¶ 3, 20.  Both groups are also subject to Meta's Community Standards and Instagram's Community Guidelines.  *Id.* ¶ 20.

Meta's Commercial Terms require a user to ensure that any third party the user acts on behalf of abides by applicable terms of use and require that "access or use of the Meta products for business or commercial purposes complies with all applicable laws, rules, and regulations."  *Id.* ¶¶ 36–38.

Meta's Ad Standards apply to ads on Facebook and Instagram and "prohibit ads promoting products, services, schemes or offers using deceptive or misleading practices, including those

meant to scam people out of money or personal information." *Id.* ¶¶ 39–40.

Meta's Self-Serve Ad Terms apply to use of ad interfaces and any order placed through the ad interfaces (an "Order"). *Id.* ¶ 41. These Terms require that "ads must comply with all applicable laws, regulations, and guidelines" and require payment of all amounts specified in each Order placed. *Id.* ¶¶ 42–43. These Terms state that if an

> account is past due, we may take additional steps to collect past due amounts. You will pay all expenses associated with such collection, including reasonable attorneys' fees. Past due amounts will accrue interest at 1% per month or the lawful maximum, whichever is less.

*Id.* ¶ 44. In addition, advertisers must agree to Meta's Online Invoicing Terms for any Order placed through Facebook's online advertising portal for which Facebook agrees to invoice the advertiser; under these Terms, advertisers must "make all payments within thirty (30) days of the date of the applicable invoice." *Id.* ¶ 45.

Meta reviews products sold through Facebook and Instagram ads by soliciting feedback from customers who purchased products and employing shoppers to purchase and evaluate products. *Id.* ¶ 22. If an advertiser violates any of Meta's policies, Meta can ban their account from running ads and disable all Facebook and Instagram accounts belonging to that advertiser. *Id.* ¶ 23.

Certain businesses with accounts on Facebook or Instagram are eligible to apply for ad credit lines. *Id.* ¶ 21. Once approved,

> advertisers are provided a credit line for limited ad costs, which represents the maximum amount a business could spend on ads on a monthly basis before payment is required. Monthly invoices are provided for any ads purchased using these credit lines and are payable within 30 days of issuing. Businesses may seek modifications to their credit lines, for instance, to increase limits.

*Id.*

### c.      Facebook Pages

Facebook users with the role of administrator or moderator can manage a Facebook Page and create and run ads on behalf of the Page. *Id.* ¶¶ 24–25. Anyone who manages a Facebook Page must agree to Meta's Commercial Terms. *Id.* ¶ 36. While any Facebook user can leave a

comment on a Facebook Page, the Page's administrators and moderators control posted content by choosing specific words or phrases to block from the page—this results in the comment containing blocked content being hidden from the Page.  *Id.* ¶ 26.

### 2.    The Parties' Relationship

Defendant Liévano created, controlled, and used (1) multiple Instagram user accounts between September 7, 2011, and April 4, 2025, and (2) multiple Facebook user accounts between February 13, 2019, and April 4, 2025.  *Id.* ¶¶ 47–49.

Defendant Judang, including by and through Liévano, created and controlled a Facebook business account on February 1, 2021, titled, "Judang Team," along with related advertising accounts.  *Id.* ¶ 52.  On September 7, 2022, Judang created a Facebook Page with the name "Judang Team."  *Id.* ¶ 53.  On May 27, 2024, Defendants submitted a Judang fiscal year 2023 balance sheet to Meta to obtain an advertising credit line increase.  *Id.* ¶ 56; *see id.*, Ex. 3 ("Judang Balance Sheet") (ECF No. 1-3).

Defendant Perfeos, including by and through Liévano, created and controlled a Facebook business account on July 17, 2023, titled, "Shop at Mars," along with related advertising accounts. *Id.* ¶ 52.  On September 25, 2023, Perfeos created a Facebook Page with the name "Shop at Mars." *Id.* ¶ 53.  On April 23, 2024, Defendants submitted a Perfeos fiscal year 2022 balance sheet to Meta to obtain an advertising credit line increase.  *Id.* ¶ 56; *see id.*, Ex. 2 ("Perfeos Balance Sheet") (ECF No. 1-2).

Defendant J&J, including by and through Liévano, created and controlled a Facebook business account on October 29, 2023, titled, "Jot & Journeys," along with related advertising accounts.  *Id.* ¶ 52.  On January 19, 2024, J&J created a Facebook Page with the name "Jot & Journeys."  *Id.* ¶ 53.  On April 1, 2024, Defendants submitted a J&J fiscal year 2022 balance sheet to Meta to obtain an advertising credit line increase.  *Id.* ¶ 56; *see id.*, Ex. 1 ("J&J Balance Sheet") (ECF No. 1-1).

Collectively, between February 2021 and July 2024, Judang, Perfeos, and J&J (1) "created and ran, and caused to be created and run, over 9,000 ads on Facebook and Instagram"; and (2) "created, managed or used more than 100 Facebook Pages and more than 40 Business Manager

United States District Court
Northern District of California

accounts." *Id.* ¶ 50. Additionally, "Defendants, including by and through Liévano, created, managed, or used more than 100 other Facebook Pages." *Id.* ¶ 53.

In April 2024, Defendants stopped paying their ad invoices after accumulating "an outstanding balance of, at least, $8,111,746.62." *Id.* ¶ 59. Meta denied all credit line increases to Defendants between June 3–17, 2024. *Id.* ¶ 69. Meta also suspended all credit lines for Judang, Perfeos, and J&J because Defendants violated Meta's Self-Serve Ad Terms and Meta's Online Invoicing Terms. *Id.* ¶¶ 70–71.

On February 11, 2025, Meta sent Defendants a cease-and-desist letter

> for their violations of Meta's and Instagram's Terms, Ad Policies, and Self-Serve Ad Terms, and failure to pay ad invoices. At that time, Meta also disabled more than 150 Facebook user accounts, Instagram accounts, business accounts, and Facebook Pages associated with Defendants.

*Id.* ¶ 72; *see id.*, Ex. 4 ("Cease-and-Desist Letter") (ECF No. 1-4). In the Cease-and-Desist Letter, Meta provided links to its various Terms, demanded that Defendants stop violating the Terms, and informed Defendants that they were not authorized to access Facebook or Instagram "for any reason whatsoever." *Id.* ¶ 73. On February 11, 2025, Liévano controlled and used an Instagram account, and on February 24, 2025, Liévano controlled and used a Facebook account; Meta disabled both accounts on April 4, 2025. *Id.* ¶¶ 49, 74.

### 3. Defendants' Improper Activities

Meta alleges the following in the Complaint. Starting in October 2023, Defendants facilitated bait-and-switch and subscription fraud schemes using Facebook and Instagram ads. *Id.* ¶ 54. To finance their schemes, "Defendants knowingly submitted false and materially misleading documents and made false and misleading statements in order to induce Meta into providing multiple credit line increases." *Id.* ¶ 55. Defendants submitted substantively identical balance sheets for Judang, Perfeos, and J&J to obtain credit line increases for those entities and did not tell Meta "that they submitted the same financial documentation for multiple entities." *Id.* ¶¶ 56, 87; *see id.*, Exs. 1–3. Defendants also submitted other false financial documents including balance sheets, income statements, and banking statements, to prove their creditworthiness. *Id.* ¶¶ 57, 86. Finally, Defendants "did not tell [Meta] that the financial statements they submitted were not

6

United States District Court
Northern District of California

audited" when Meta requested audited statements. *Id.* ¶ 87. "Meta reasonably and justifiably relied on these false and materially misleading financial statements and Defendants' related statements and omissions when deciding to approve Defendants' requests for credit line increases." *Id.* ¶ 58.

Defendants then purchased ads from Meta using the fraudulently obtained credit lines from Meta and agreed to have Meta invoice them for the ad purchases. *Id.* ¶¶ 60, 73. Collectively, "Defendants placed more than 9,000 deceptive and misleading ads for merchandise on Facebook and Instagram." *Id.* ¶ 60. These ads redirected other users to Defendants' e-commerce websites where users could purchase the advertised merchandise. *Id.* ¶¶ 61–62. For users who purchased merchandise from Defendants' websites, some received "low-quality and counterfeit goods," and some did not receive merchandise at all. *Id.* ¶¶ 63–65. Other users "were charged recurring subscription fees that they did not authorize." *Id.* ¶¶ 66–67.

"Defendants attempted to conceal their schemes from Meta and its users by blocking users from posting complaints and negative reviews on Defendants' Facebook Pages. . . . In total, Defendants blocked more than 1,000 words and phrases associated with poor product quality, failure to deliver products, slow delivery times, and negative customer experience from Facebook Pages they controlled." *Id.* ¶ 68.

**B.      Procedural Background**

On June 18, 2025, Meta filed its complaint against Defendants Judang, Perfeos, J&J, and Liévano, alleging two causes of action under California law: (1) Breach of Contract; and (2) Fraud. Compl. ¶¶ 75–91 (ECF No. 1). Meta seeks, *inter alia*, "a permanent injunction that prohibits Defendants from continuing their bait and switch and subscription schemes" and damages. *Id.* at 3, 24.

On November 6, 2025, Defendants filed the instant Motion to Dismiss pursuant to Rule 12(b)(6). ECF No. 33 ("Mot."). On November 20, 2025, Meta filed an Opposition. ECF No. 38 ("Opp."). On November 26, 2025, Defendants filed a Reply. ECF No. 39 ("Reply").

United States District Court
Northern District of California

### III.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim.  A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (cleaned up).  Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Thus, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *Twombly*, 550 U.S. at 555 (citation omitted).

In considering a motion to dismiss, the court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *accord Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up).  A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Courts have broader discretion in denying motions for leave to amend after leave to amend has already been granted.

*See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) ("[W]hen the district court has already afforded a plaintiff an opportunity to amend the complaint, it has wide discretion in granting or refusing leave to amend after the first amendment, and only upon gross abuse will its rulings be disturbed.") (cleaned up); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent motions to amend is particularly broad.") (cleaned up).

## IV.    DISCUSSION

Defendants move to dismiss both of Meta's claims for failing to state a cognizable claim. Mot. at 1. In sum, the Court concludes that Meta alleges cognizable claims for breach of contract and fraud. Therefore, dismissal of Claims 1 and 2 is not warranted.

### A.    Breach Of Contract Claim (Claim 1)

Defendants argue that Meta's Breach of Contract claim fails against Liévano because he "was not a party to any pertinent contract (no privity)." Mot. at 1:1–9. Defendants further argue that the claim fails because it "is impermissibly vague and fails to comply with FRCP Rule 8." *Id.*

To prevail on a breach of contract claim under California law, a plaintiff must prove "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). "Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009) (emphasis in original). Whether a party breached a contract is a question of fact. *Locke v. Warner Bros.*, 57 Cal. App. 4th 354, 365 (1997).

Here, the Court concludes that Meta alleges a cognizable breach of contract claim against each Defendant. Accordingly, the Court **DENIES** Defendants' motion to dismiss Meta's Breach of Contract Claim (Claim 1).

#### 1.    Privity For Defendant Liévano

Defendants argue that Meta's Breach of Contract claim against Liévano fails because it does not "plausibly allege that Liévano personally entered into or was bound by any of the cited agreements." Mot. at 4:5–5:27. Meta contends that Liévano has liability because (1) "Liévano

9

breached Meta's Terms in his personal capacity"; and (2) Liévano breached "each contract identified in the Complaint because he did business as the other three Entity Defendants." Opp. at 3:24–7:12.

For a cognizable breach of contract claim, a plaintiff must allege sufficient facts showing the existence of a contract between the parties. *Oasis*, 51 Cal. 4th at 821. Contractual privity exists between parties who are in a contractual relationship with one another. *See Windham at Carmel Mountain Ranch Ass'n v. Superior Ct.*, 109 Cal. App. 4th 1162, 1176 (2003) ("Privity of contract is a *relationship* that is a prerequisite for maintaining certain causes of action[.]") (emphasis in original). An essential element of any contract is mutual consent. *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Id.* (cleaned up).

Here, the Court finds that Meta pleads sufficient facts to plausibly allege that Liévano was contractually bound by each of Meta's cited agreements. Defendants argue that "Liévano cannot be held personally liable for breach of contract" because the alleged breaches "are corporate acts, not personal ones." Mot. at 4:7–14. But it is axiomatic that only corporations can conduct "corporate acts." *See Frances T. v. Vill. Green Owners Ass'n*, 42 Cal. 3d 490, 506–08 (1986) (discussing corporate acts). To that end, Defendants' assertion that Meta "attempts to treat Liévano as a party to the agreements . . . without regard for the entity form" is false. Mot. at 4:24–27. In Defendants' own words, Meta alleges that "Liévano is the owner and operator" of "the unincorporated J&J" business. *Id.* at 1:11–13, 4:7–11 (citing Compl. ¶ 8). For an unincorporated entity, "[a] sole owner is a sole proprietorship and a sole proprietorship is not a legal entity separate from its individual owner." *Ball v. Steadfast-BLK*, 196 Cal. App. 4th 694, 701 (2011). Thus, Meta's allegations regarding J&J pertain directly to Liévano. *See id.* ("Use of a fictitious business name does not create a separate legal entity distinct from the person operating the business.") (cleaned up); *see also* Opp. at 7:1–12 ("Liévano, as sole operator of this unregistered entity is thus personally liable for J&J's conduct.").

Meta alleges that J&J created a Facebook business account and a Facebook Page, purchased ads from Meta that required invoicing, and placed ads on Facebook and Instagram.

10

Compl. ¶¶ 52–53, 56, 60, 73.  Through these actions, J&J entered into each of the contracts alleged by Meta.  *See id.* ¶¶ 3, 20, 27, 32, 45 (alleging Facebook account creation binds a user to Meta's Terms, Instagram use binds a user to Instagram's Terms, publishing an ad on Facebook binds a user to Meta's Self-Serve Ad Terms, Meta's Commercial Terms, and Meta's Ad Standards, and purchasing ads that Meta agrees to invoice for binds a user to Meta's Online Invoicing Terms).  Therefore, because J&J entered into contracts with Meta, Liévano also entered into contracts with Meta.  As such, the Court need not reach Defendants' arguments that Meta fails to "specify that Liévano created or used accounts *personally* (as opposed to through the entities)" and does not properly plead "an alter ego theory . . . to pierce the corporate veil."  Mot. at 4:15–18, 5:10–15 (emphasis in original).  At the pleadings stage, Meta plausibly alleges that Liévano and Meta have contractual privity resulting from Liévano's acts through J&J.

Defendants' lone cited case is inapposite.  *See* Mot. at 5:4–9 (citing *Frances T.*, 42 Cal. 3d at 512 n.20).  *Frances T.* involved a corporate defendant—the question presented was whether the entity's board of directors were liable for, *inter alia*, breach of contract.  *Frances T.*, 42 Cal. 3d at 495, n.1.  The California Supreme Court explained that because the defendant entity was a corporation, "[t]he board members may not be held personally liable absent allegations that they entered into a contract with plaintiff on their own behalf or purported to bind themselves personally."  *Id.* at 512 n.20; *see also United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 595 (1970) ("Directors and officers are not personally liable on contracts signed by them for and on behalf of the corporation unless they purport to bind themselves individually.").  But here, J&J is not a corporate defendant, nor is Liévano a corporate officer of J&J.  Compl. ¶ 8.  Therefore, the analysis in *Frances T.* does not apply to the Court's analysis here regarding Liévano's liability for contracts entered into by J&J.

### 2.    Pleading Under Rule 8

Defendants argue that Meta's Breach of Contract claim fails under Rule 8 for being "impermissibly vague because, in addition to lumping all the Defendants together, there are no distinctions about which contracts are at issue."  Mot. at 6:1–7:21.  Meta contends that its Complaint puts "each Defendant on notice that it is alleged to have violated Meta's and

11

Instagram's Terms and Policies and of the specific conduct amounting to a breach." Opp. at 7:13–9:27.

Under the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The failure to comply with Rule 8 is a basis for dismissal that is not dependent on whether the complaint is without merit. *McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996). "Something labeled a complaint but written . . . without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *Id.* at 1180. To comply with Rule 8, a complaint need not provide detailed factual allegations, but it is "a plaintiff's obligation to provide the grounds of his entitlement to relief." *Twombly*, 550 U.S. at 555 (cleaned up). A plaintiff must do more than assert "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, the plaintiff must provide sufficient factual allegations "to state a claim to relief that is plausible on its face." *Id.* at 570.

Here, the Court finds that Meta pleads sufficient facts to plausibly allege a breach of contract claim against each Defendant. Defendants first argue that there "is an abundance of authority for the notion that lumping together factual allegations and claims against several defendants does not comply with FRCP Rule 8." Mot. at 6:2–24. Meta counters that a "complaint is not insufficient merely because it refers to defendants in the plural where more than one defendant is alleged to have taken the actions described in the Complaint." Opp. at 7:19–8:5. Meta has the better argument. Defendants cite to no authority—and the Court is aware of none— supporting their proposition that collective allegations constitute a *per se* violation of Rule 8. *See, e.g., Russo v. Fed. Med. Servs., Inc.*, 744 F. Supp. 3d 914, 922 (N.D. Cal. 2024) ("Collective allegations can be sufficient . . . if the claims involve actors engaged in the same or similar conduct."). Instead, the touchstone of Rule 8 is fair notice. *Twombly*, 550 U.S. at 555. Meta's Complaint "defines 'Defendants' plural as collectively referring to all four Defendants." Opp. at 8:6–10 (citing Compl. ¶ 1). The Complaint then uses the term "Defendants" when signaling that an allegation applies to each Defendant, such as when each Defendant placed "deceptive and

United States District Court
Northern District of California

misleading ads on Facebook." *Id.* at 8:6–28 (citing Compl. ¶¶ 60–65, 68). When necessary, the Complaint parses the individual Defendants. *See id.* at 8:10–22 (citing Compl. ¶¶ 47–48, 50–53) (discussing when each individual Defendant entered contracts with Meta). Overall, Meta alleges that each of the four Defendants contracted with Meta and each Defendant breached their contracts, often by committing the same misconduct—this permits each Defendant to respond to the allegations levied against them. *Id.* at 8:10–9:8 (citing Compl. ¶¶ 47–48, 50–53, 60–68); *cf. EcoHub, LLC v. Recology Inc.*, No. 22-cv-09181-TSH, 2023 WL 6725632, at *6 (N.D. Cal. Oct. 11, 2023) (finding collective allegations put individual defendants on notice and explaining "[w]hile some allegations are overlapping, this is appropriate given the claims"). Therefore, group pleading is not fatal in this case because Meta's group allegations still give Defendants fair notice of the breach of contract claim against them. *See DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, No. 16-cv-06385-JSW, 2018 WL 10247483, at *15 (N.D. Cal. Sept. 24, 2018) ("'[G]roup pleading' is not fatal as long as the complaint gives defendants fair notice of the claims against them.").

Moreover, despite Defendants' assertion to the contrary, Meta's allegations establish which specific contracts are at issue.[3] *See* Mot. at 6:25–7:11. Meta alleges that Facebook account creation binds users to Meta's Terms; Instagram use binds users to Instagram's Terms; advertising on Facebook or Instagram binds users to Meta's Self-Serve Ad Terms, Meta's Commercial Terms, and Meta's Ad Standards; and agreeing to invoicing binds users to Meta's Online Invoicing Terms. Compl. ¶¶ 3, 20, 27, 32, 45. Meta also "alleges that each Defendant agreed to Meta's and Instagram's Terms and Policies by creating and using various Facebook and Instagram accounts." Opp. at 8:10–22 (citing Compl. ¶¶ 47–48, 50–53). As such, Meta plausibly alleges that each Defendant entered into each of the six contracts at issue and faces liability under each contract.

---

[3] In their argument, Defendants provide an example where the Complaint refers to "Meta's Terms." Mot. at 7:2–11 (citing Compl. ¶ 78). Defendants assert that it is unclear "which agreement from all of 'Meta's Terms' these allegations are purportedly directed toward." *Id.* The Court is not sure what to make of this statement. In its Complaint, Meta identifies each of the contracts at issue, describes each contract, and provides website links to access each contract. *See* Compl. ¶¶ 3, 27–45. Using this information, it is clear that "Meta's Terms" refers to Meta's Terms of Service which "[e]veryone who uses Facebook must agree to." *Id.* ¶¶ 3, 27. Thus, Defendants' example fails to demonstrate that Meta does not identify the specific contracts at issue.

13

Finally, Defendants' argument that the Complaint fails to distinguish "who received the line of credit" falls flat. Mot. at 7:12–19. Meta alleges that Judang, Perfeos, and J&J received lines of credit. Compl. ¶¶ 55–56. Therefore, Meta's breach of contract claim complies with Rule 8.

## B.    Fraud Claim (Claim 2)

Defendants argue that Meta's Fraud claim fails because it "is barred by California's economic loss rule" and "the Complaint fails to plead with the particularity required by FRCP Rule 9(b)." Mot. at 1:1–9.

Under California law, a tortious breach of contract may be found when "the breach is accompanied by a traditional common law tort, such as fraud or conversion." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). The "elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Id.* "False representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (cleaned up). Fraudulent intent is a question of fact. *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1061 (2012).

Here, the Court concludes that Meta alleges a cognizable fraud claim against each Defendant. Accordingly, the Court **DENIES** Defendants' motion to dismiss Meta's Fraud Claim (Claim 2).

### 1.    Economic Loss Doctrine

Defendants argue that the economic loss rule bars Meta's Fraud claim because it is "not based on any independent duty" and "[t]he facts recited are identical to the facts used to describe [Meta's] breach of contract claim[.]"[4] Mot. at 7:22–8:17. Meta contends that the economic loss

---

[4] In their Reply, Defendants argue for the first time that "although the Opposition argues that the Complaint alleges 'knowing and intentional' conduct that amounts to fraud, the Complaint does not contain clear allegations to that effect." Reply at 7:2–10 (emphasis in original). Defendants cannot sandbag Meta with new arguments raised for the first time in their Reply. *See VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953, 974–75 (N.D. Cal. 2023) (declining to consider argument raised for the first time in reply brief because argument was waived); *Competitive Techs., Inc. v.*

rule is unavailable here because Meta's Fraud claim seeks "to hold the Defendants culpable for intentionally and knowingly defrauding Meta," not for breaching contracts.  Opp. at 10:1–11:17.

California's economic loss doctrine "is deceptively easy to state:  In general, there is no recovery in tort for *negligently* inflicted purely economic losses, meaning financial harm unaccompanied by physical or property damage."  *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 20 (2024) (emphasis in original) (cleaned up).  The rule "prevents the law of contract and the law of tort from dissolving one into the other"; it "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."  *Robinson*, 34 Cal. 4th at 988 (cleaned up).  As such, the rule does not bar a fraud claim that is independent of a breach of contract claim.  *Id.* at 991. Instead, "the rule functions to bar claims in negligence for pure economic losses in deference to a contract between litigating parties."  *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022).

"California law distinguishes between fraud in the 'execution' or 'inception' of a contract and fraud in the 'inducement' of a contract."  *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415 (1996).  Fraud in the inducement "occurs when the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable.*"  *Id.* (emphasis in original) (cleaned up).  The economic loss doctrine does not preclude tort damages where a contract was fraudulently induced.  *Robinson*, 34 Cal. 4th at 989–90; *see also Harris v. Atlantic Richfield Co.*, 14 Cal. App. 4th 70, 78 (1993) ("when one party commits a fraud during the contract formation or performance, the injured party may recover in contract and tort").

Here, the Court finds that because Meta pleads sufficient facts to plausibly allege that Defendants fraudulently induced Meta to contract with them, the economic loss doctrine does not preclude Meta's fraud claim.  Defendants argue that Meta's fraud claim is simply a disguised

*Fujitsu Ltd.*, 333 F. Supp. 2d 858, 863–63 (N.D. Cal. 2004) (declining to reach arguments raised for the first time in reply brief and noting fairness concerns).  The Court therefore declines to reach this argument.

United States District Court
Northern District of California

breach of contract claim.  Mot. at 8:12–17.  Not so.  Meta alleges that Defendants submitted false financial documents as part of their applications for ad credit lines with Meta, that Meta relied on the false documents when it decided to extend credit lines to Defendants, and that as a result, Meta extended $8.1 million in credit lines to Defendants which they failed to pay back.  Compl. ¶¶ 55–59, 85–91.  In other words, Meta alleges that Defendants' fraudulent conduct induced Meta to extend millions of dollars in ad credit lines which in turn induced Meta to enter contracts with Defendants that governed the credit lines.  Opp. at 10:1–8, 11:7–14.  Under California law, Meta's theory of harm—that it was fraudulently induced into certain contracts with Defendants—is exactly the type of claim where tort damages are allowed.  *Id.* at 10:1–8; *see Robinson*, 34 Cal. 4th at 989–90.

In their Reply, Defendants insist that permitting Meta's fraud claim would contravene California law.  Reply at 6:8–7:1 (citing *Rattagan*, 17 Cal. 5th at 21, 26–27).  Defendants assert that the "pertinent contract as it relates to the alleged fraud is Meta's Self-Serve Ad Terms."  *Id.* According to Defendants, Meta's fraud claim fails because the "extent of the damages suffered from the alleged fraud is non-payment, which was clearly contemplated in the contract."  *Id.* Defendants miss the mark.  To be sure, non-payment is a reasonably foreseeable consequence of extending credit to another party.  *See Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 870–71 (1968) (discussing risk of loan notes not being paid).  However, "[n]o rational party would enter into a contract anticipating that they are or will be lied to."  *Robinson*, 34 Cal. 4th at 993.  So while the parties' contracts may cover Meta's risk of non-payment associated with extending credit lines to Defendants, those contracts did not contemplate that Meta would calculate its risk based upon Defendants' false creditworthiness.  *See* Opp. at 11:7–14.  As such, Defendants' reliance on *Rattagan* is misplaced.  As explained by the *Rattagan* court, Defendants have potential liability in tort, not because they breached the contracts through non-payment, but because they separately used affirmative misrepresentations to induce Meta into the contracts in the first place. *Rattagan*, 17 Cal. 5th at 33.

In sum, Meta alleges it suffered economic losses due to Defendants' intentionally tortious conduct, not just those attributable to Defendants' breach of contract; thus, the economic loss

United States District Court
Northern District of California

doctrine simply does not apply. *Id.* at 34. Therefore, Meta's fraud claim passes muster under the economic loss rule.

### 2.    Particularity Under Rule 9(b)

Defendants argue that Meta's Fraud claim fails under Rule 9 because (1) "[t]he Complaint lumps all the Defendants together, almost uniformly, throughout the facts and causes of action"; (2) there is no information about "other financial documents submitted by Defendants with their credit line applications"; and (3) Defendants cannot "decipher what alleged misrepresentations are attributable to who." Mot. at 8:18–9:26. Meta contends that "the Complaint pleads fraud with the particularity required by Rule 9(b)." Opp. at 11:18–13:6.

Under the Federal Rules of Civil Procedure, where a plaintiff asserts a claim sounding in fraud, the plaintiff must "state with particularity the circumstances regarding fraud or mistake." Fed. R. Civ. P. 9(b). A claim sounds in fraud if the plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). The context surrounding the fraud must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up). Thus, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (cleaned up).

Here, the Court finds that Meta pleads sufficient facts to allege its fraud claim with the requisite particularity against each Defendant. Meta argues that its fraud claim complies with Rule 9(b) because "[i]t identifies the 'who, what, when, where, and how' of the fraud." Opp. at 12:8–22. The Court agrees. Meta alleges that Liévano, Judang, Perfeos, and J&J (the "who") induced Meta to provide ad credit lines (the "what") on the dates they submitted credit applications (the "when") through Meta's online platform (the "where") by submitting false financial information (the "how"). *Id.* (citing Compl. ¶¶ 1, 8–9, 56, 85–90). This is all that Rule 9(b) requires. *Vess*, 317 F.3d at 1106; *cf. Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1263 (N.D. Cal. 2022) ("These allegations are specific enough to give Roblox notice of how Doe believes it

17

defrauded her.").

Defendants' arguments to the contrary are unavailing. First, as discussed, "the Complaint is not deficient merely because it refers to 'Defendants' plural when alleging conduct attributed to each Defendant individually." Opp. at 12:23–13:2. In the same token, the Complaint sufficiently alleges that each Defendant defrauded Meta by inducing Meta to provide credit lines based on false financial information. *See id.* ("[T]he Complaint makes clear that each Defendant has engaged in the same misconduct."). Thus, because the Complaint alleges that *each Defendant* submitted false information in the form of unaudited balance sheets, income statements, and banking records, Defendants are incorrect that they cannot "decipher what alleged misrepresentations are attributable to who." Mot. at 8:18–9:26; *see* Compl. ¶¶ 55–57, 86–87. Particularity is not lacking merely because the Defendants engaged in the same purported misconduct. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in pleading [under Rule 9(b)] where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."); *Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (explaining that "a complaint need not distinguish between defendants that had the exact same role in a fraud" to comply with Rule 9(b)).

Second, Meta describes Defendants' alleged misconduct with sufficient detail to provide them with notice. Meta provides detailed information on balance sheets submitted by Defendants with their ad credit line applications; in fact, Meta attaches copies of these balance sheets to the Complaint. Compl. ¶ 56, Exs. 1–3. Meta further alleges that Defendants submitted other false financial documents with their credit line application. *Id.* ¶ 57. Defendants complain that Meta does not allege where the financial documents "originated, why they evidence fraud, or when they were created." Reply at 7:13–28. But Rule 9(b) only requires a plaintiff to set forth "what is false or misleading about a statement, and why it is false." *United Healthcare*, 848 F.3d at 1180. Meta's allegations that the financial documents provided false information regarding Defendants' "financial states and assets" in order to mislead Meta as to Defendants' creditworthiness for ad credit lines clear this hurdle. Compl. ¶ 86. Therefore, Meta's fraud claim complies with Rule

9(b).

## V.    CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' Motion to Dismiss.

**IT IS SO ORDERED.**

Dated: January 20, 2026

_____
THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

19